518 So.2d 524 (1987)
Lea P. KOBUSZEWSKI, et al., Plaintiffs-Appellees,
v.
W. Carey SCRIBER, et al., Defendants-Appellants.
No. 19091-CA.
Court of Appeal of Louisiana, Second Circuit.
December 2, 1987.
Rehearing Denied January 14, 1988.
*526 Mayer, Smith & Roberts by Caldwell Roberts, Shreveport, for defendant-appellant Nat. Reserve Life Ins. Co.
Blanchard, Walker, O'Quin & Roberts by Joseph W. Milner, Shreveport, for defendant-appellant First Nat. Bank of Shreveport.
Cook, Yancey, King & Galloway by Bernard S. Johnson and Curtis R. Shelton, Shreveport, for defendant-appellant Commercial Nat. Bank.
Lunn, Irion, Johnson, Salley & Carlisle by Charles W. Salley and James A. Mijalis, Shreveport, for defendant-appellant First Sec. Bank & Trust Co.
Howard Marks, New Orleans, for third party defendant-appellee U.S. Fire Ins. Co.
Dean R. Veatch, Shreveport, for plaintiffs-appellees.
Bodenheimer, Jones, Klotz & Simmons by J.W. Jones, Shreveport, for defendant-appellee American Ins. Co.
Before JASPER E. JONES, SEXTON and LINDSAY, JJ.
LINDSAY, Judge.
This case arose from a scheme to sell bogus insurance policies. The plaintiffs are Lea P. Kobuszewski and her son, Sebert Mark Kobuszewski. The defendants are W. Carey Scriber, an independent insurance agent, National Reserve Life Insurance Company (National Reserve), the company Scriber purported to represent, American Insurance Company (American) and United States Fire Insurance Company (U.S. Fire), the bonding companies of National Reserve Life, First National Bank of Shreveport (FNB), Commercial National Bank (CNB) and First Security Bank and Trust of Haughton (FSB). The litigation involved numerous claims, cross claims and third party demands among the various parties. The trial court entered judgment in favor of the plaintiffs' against Scriber, CNB, FNB, FSB and National Reserve. National Reserve, CNB, FNB and FSB have appealed the trial court judgment. For the following reasons, we affirm in part, amend in part and reverse in part, the trial court judgment.

FACTS
The plaintiffs in this case are Lea P. Kobuszewski, a nurse, and her son, Sebert Mark Kobuszewski, a medical technologist. In October, 1980, Mrs. Kobuszewski was introduced to W. Carey Scriber by a fellow hospital worker. Scriber purported to be a seller of tax deferred annuities for National Reserve. Scriber represented that the annuities bore twenty percent interest per annum.
Although Scriber always represented himself as an agent of National Reserve, he had actually been terminated from that capacity in October of 1980. Without authority, Scriber opened two checking accounts *527 in the name of National Reserve, one at CNB and the other at FSB.
On November 5, 1980, Mrs. Kobuszewski invested $10,000 with Scriber by means of a check drawn on FNB made payable to National Reserve. Scriber deposited the check in an account at CNB which he had opened in the name of National Reserve. The check was indorsed on the back, "W. Carey Scriber, General Agent, Estate Financial Consultant, National Reserve Life." The indorsement was followed by a Shreveport address and phone number.
Thereafter, until July 27, 1982, Mrs. Kobuszewski made periodic deposits with Scriber. The total amount paid by Mrs. Kobuszewski to Scriber for annuities was $70,000. The checks were each similarly indorsed in the name of National Reserve and deposited into accounts with either CNB or FSB. The amounts of the checks, the dates and the banks concerned are represented by the following table.

 Depository, or Bank Drawee
 Collecting Cleared (Payor)
 Date Amount Bank Through Bank 
11/05/80 $10,000.00 CNB FNB
02/03/81 10,000.00 CNB FNB
01/06/81 20,000.00 CNB FNB
03/19/81 10,000.00 CNB FNB
04/30/81 10,000.00 CNB FNB
06/14/81 5,000.00 CNB FNB
07/27/82 5,000.00 FSB CNB FNB
 __________
 $70,000.00

Mrs. Kobuszewski advised her son, Mark, that the annuities were a good investment and encouraged him to invest with Scriber. From July 25, 1981 to October 2, 1981, Mr. Kobuszewski invested $33,500 with Scriber. Scriber also deposited these checks into accounts in the name of National Reserve at either CNB or FSB. The amounts of checks written by Mr. Kobuszewski, the dates and the banks concerned are represented by the following table.

 Depository, or Drawee
 Collecting (Payor)
 Date Amount Bank Bank 
06/25/81 $20,000.00 CNB FNB
09/04/81 2,000.00 CNB CNB
05/06/82 9,000.00 CNB CNB
08/03/81 1,000.00 CNB RBG
09/04/81 1,000.00 CNB RBG
10/02/81 500.00 CNB RBG
 __________
 $33,500.00

The Kobuszewskis were unaware that Scriber was no longer an agent for National Reserve at the time the investments were made. Scriber never transferred the money to National Reserve and no annuities were issued to the plaintiffs. Scriber had set up a scheme whereby he opened checking accounts at CNB and FSB in the name of National Reserve without authorization from the company. Scriber then purported to sell annuities to clients, indorsed the checks as agent for National Reserve and deposited them to the accounts for his own use.
In September or October, 1980, National Reserve first became aware of Scriber's scheme when it was contacted by Mrs. Margaret Jolley. Mrs. Jolley had also invested money with Scriber to purchase annuities, but Scriber had failed to remit Mrs. Jolley's payment to National Reserve. Scriber admitted to officials with National *528 Reserve that he had converted Mrs. Jolley's payment to his own use. Scriber's agency with National Reserve was terminated. National Reserve notified the Louisiana Insurance Commission of the termination on October 29, 1980.
Around September, 1983, Mr. Kobuszewski was contacted at his place of employment by two other insurance agents who were presenting various plans to the employees. Mr. Kobuszewski questioned the agents about the high rate of interest allegedly being paid on his National Reserve annuities. The agents encouraged Mr. Kobuszewski to investigate the matter.
In December, 1983, Mr. Kobuszewski contacted National Reserve and learned that no money had been received by National Reserve and no annuities had been issued. In January, 1984, Mr. Kobuszewski and his mother confronted Scriber who admitted there were in fact no annuity policies and that he had converted all the funds to his own use.
On April 10, 1984, the plaintiffs filed suit against Scriber and National Reserve. Also named as defendants were American Insurance and U.S. Fire Insurance, the bonding companies of National Reserve. The plaintiffs also sued CNB and FSB for allowing Scriber to open accounts in the name of National Reserve without determining he had authority to do so. Mrs. Kobuszewski also filed suit against her bank, FNB, for paying checks bearing indorsements forged by Scriber.
A plethora of cross claims and third party demands followed.
National Reserve filed a third party demand against Scriber, American Insurance, U.S. Fire Insurance and CNB.
American Insurance and U.S. Fire Insurance each filed cross claims against Scriber, CNB and FSB.
CNB filed a third party demand against FSB and National Reserve.
FSB filed a third party demand against Scriber.
FNB filed a third party demand against CNB, claiming CNB warranted that all signatures and indorsements on checks which it paid were genuine and authorized.

TRIAL COURT ACTION
A partial summary judgment was rendered in favor of FNB and CNB on some of the claims filed by Mrs. Kobuszewski. The trial court found that, as to some of the checks written by Mrs. Kobuszewski, she failed to discover and give notice to the banks of the forged indorsements within the time limits provided by LSA-R.S. 10:4-406(4). Mrs. Kobuszewski has not appealed this judgment, nor has she answered the appeal of the other parties. Therefore, this portion of the case is not before this court for review.
American Insurance and U.S. Fire Insurance each filed motions for summary judgment which were referred to the merits of the case.
The case was tried May 23, 1985. On June 9, 1986, the trial court filed a judgment.
The plaintiffs' claims against National Reserve were rejected because National Reserve did not clothe Scriber with apparent authority that he was acting as an agent of National Reserve.
Mrs. Kobuszewski was granted judgment against Scriber for her initial investment of $10,000, represented by the check dated November 5, 1980. Mrs. Kobuszewski's claims against FNB and CNB on this check had prescribed.
Mrs. Kobuszewski was awarded judgment against CNB and FNB, in solido, for $25,000 and FSB, CNB and FNB were found to be solidarily liable for $5,000, on the various forged indorsements. Judgment was also rendered against CNB for $30,000 on the forged indorsements.
In addition, Mrs. Kobuszewski was awarded a total of $17,500 in attorney fees, with FSB to pay $1,500 of this amount and CNB to pay the remaining $16,000, the trial court finding that attorney fees were authorized pursuant to LSA-R.S. 10:4-207(3).
Mr. Kobuszewski was awarded judgment against FSB and CNB, in solido, in the amount of $9,000 on the various forged *529 indorsements. Judgment was also rendered against CNB for $24,500 on the forged indorsements.
Mr. Kobuszewski was also awarded attorney fees in the amount of $9,700, with FSB to pay $2,700 and CNB to pay the remaining $7,000.
The trial court went on to consider CNB's claim against National Reserve for its failure to notify the bank of Scriber's unauthorized activities following the incident with Mrs. Jolley. The court found that through the Jolley incident, National Reserve was put on notice that Scriber had opened an unauthorized account at CNB in the name of National Reserve. The court found that National Reserve was at fault in failing to notify CNB. The court also found that CNB was negligent in failing to make its own investigation into Scriber's authority to open the account for National Reserve. The court found the parties to be equally at fault and awarded CNB judgment against National Reserve for one-half the total amount CNB was obligated to pay the plaintiffs.
The trial court rendered judgment in favor of CNB, FSB and National Reserve against Scriber for all amounts they were obligated to pay the plaintiffs both on the claims on the checks and for attorney fees.
National Reserve's claims against the bonding companies, American Insurance and U.S. Fire Insurance, were rejected because coverage ceased as soon as National Reserve was aware of Scriber's unauthorized actions. National Reserve had been put on notice by virtue of the Jolley incident.
National Reserve, CNB and FSB each filed motions for new trial which were rejected by the trial court.

ISSUES ON APPEAL
National Reserve, FNB, CNB and FSB each appealed the trial court judgment.
FNB adopted all arguments made by the other appellants.
National Reserve claims the trial court erred in granting judgment in favor of CNB against National Reserve.
FSB claims the trial court erred in finding that Scriber had no authority to open a checking account.
CNB claims the trial court erred in not granting complete indemnity to CNB against National Reserve and in not allowing the plaintiff to recover against National Reserve.
CNB also claims the trial court erred in granting judgment to the plaintiff against CNB since the plaintiff's checks were not paid on forged or unauthorized indorsements.
CNB claims that the trial court erred in holding the plaintiffs had a cause of action under LSA-R.S. 10:4-207.
FSB and CNB argue that the trial court erred in not reducing the judgment in favor of the plaintiffs by the amounts refunded to them by Scriber.
National Reserve, FNB, FSB and CNB argue that the trial court erred in awarding attorney fees to the plaintiffs.

PRESCRIPTION
As stated above, both FNB and CNB filed peremptory exceptions in the trial court based upon LSA-R.S. 10:4-406, claiming that since the plaintiffs had failed to report to the banks the forged indorsements on the checks within the three year period set forth in the statute, the plaintiffs were precluded from asserting claims based on these checks. To the extent the trial court judgment on these exceptions is adverse to the plaintiffs, it is final since plaintiffs have not appealed nor answered the appeals of the other litigants. This aspect of the case is not before us for review.
In this court, National Reserve, FSB and CNB have filed peremptory exceptions of one year prescription, contending that plaintiff's action was brought under LSA-R.S. 10:3-419. This exception is distinct from those filed in the trial court and is considered for the first time on appeal. We must first address this exception prior to consideration of the various assignments of error raised by the appellants.
*530 National Reserve, FSB and CNB argue that the plaintiffs' claim was delictual in nature and was subject to the one year period of liberative prescription applicable to torts. The defendants argue that the liberative prescription period commenced when the plaintiffs knew or should have known of the tort. The defendants argue that the plaintiff's petition was filed in 1984 and that all checks involved in this case were paid between 1981 and 1982 and therefore, the plaintiff's claim had prescribed. We find defendant's contentions to be meritless.
We do not find that the plaintiffs' cause of action, as presented to the trial court and here, has prescribed. In an attempt to determine the prescriptive period applicable to this case, we must first decide which provisions of our Commercial Laws, LSA-R.S. 10:1-101 et seq., are applicable to the plaintiffs' cause of action.
CNB argues that under the recent case of Daube v. Bruno, 493 So.2d 606 (La. 1986), the plaintiffs' cause of action was based upon the tort of conversion and was subject to one year liberative prescription. We find Daube to be inapposite to the facts of the present case.
In Daube, the plaintiff was the payee of checks made by his employer. A third party forged the payee's indorsement on the checks and deposited them to her own account. The plaintiff sued the forger, the maker and the collecting bank under LSA-R.S. 10:3-419(1), which provides, in pertinent part: "... when a person pays an instrument on a forged indorsement, he is liable to the true owner." The issue on appeal was whether plaintiff's action was delictual and governed by the one year prescriptive period under LSA-C.C. Art. 3492, or whether plaintiff's action was an action on a negotiable instrument and governed by the five year prescriptive period of LSA-C.C. Art. 3498.
In Daube, the Louisiana Supreme Court held that an action by a "true owner" and payee of a check against the payor for payment on a forged indorsement is a tort action, subject to one year liberative prescription. The court overruled Top Crop Seed and Supply, Inc. v. Bank of Southwest Louisiana, 457 So.2d 273 (La.App. 3rd Cir.1984) which had previously recognized actions under LSA-R.S. 10:3-419 as actions on negotiable instruments, to which the five year liberative prescription period was applicable.
Daube recognized that LSA-R.S. 10:3-419 provides only a tort remedy for actions brought under that section, but that actions for breaches of contract, warranties and other obligations are provided under other sections of the Commercial Laws. Under the facts of Daube, the plaintiff, as the true owner and payee, had only a delictual cause of action.
However, in the present case, the plaintiffs are not the "true owners" or payees of the checks in question, but rather they are the makers of the checks.
Generally a true owner is thought of as the payee of an instrument. In order to be a "true owner" under LSA-R.S. 10:3-419, the payee must come into actual or constructive possession of the instrument. Sunbelt Factors, Inc. v. Bank of Gonzales, 481 So.2d 648 (La.App. 1st Cir.1985); Lincoln National Bank & Trust Company v. Bank of Commerce, 764 F.2d 392 (5th Cir.1985).
In the instant case, the plaintiffs are not the true owners of the check as contemplated by LSA-R.S. 10:3-419. Although they came into possession of the instruments after payment by the bank, they did not possess as payees. Therefore, the plaintiffs cause of action is not based upon LSA-R.S. 10:3-419, and the one year prescriptive period is not applicable.
Plaintiffs' cause of action falls under the warranties provisions of LSA-R.S. 10:4-207 and it is by this cause of action that the prescriptive period is to be determined. LSA-R.S. 10:4-207 provides:
(1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that *531 (a) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title; and
(b) he has no knowledge that the signature of the maker or drawer is unauthorized, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith
(i) to a maker with respect to the maker's own signature; or
(ii) to a drawer with respect to the drawer's own signature; or whether or not the drawer is also the drawee; or
(iii) to an acceptor of an item if the holder in due course took the item after the acceptance or obtained the acceptance without knowledge that the drawer's signature was unauthorized; and
(c) the item has not been materially altered, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith
(i) to the maker of a note; or
(ii) to the drawer of a draft whether or not the drawer is also the drawee; or
(iii) to the acceptor of an item with respect to an alteration made prior to the acceptance if the holder in due course took the item after the acceptance, even though the acceptance provided "payable as originally drawn" or equivalent terms; or
(iv) to the acceptor of an item with respect to an alteration made after the acceptance.
(2) Each customer and collecting bank who transfers an item and receives a settlement or other consideration for it warrants to his transferee and to any subsequent collecting bank who takes the item in good faith that
(a) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title and the transfer is otherwise rightful; and
(b) all signatures are genuine or authorized; and
(c) the item has not been materially altered; and
(d) no defense of any party is good against him; and
(e) he has no knowledge of any insolvency proceeding instituted with respect to the maker or acceptor or the drawer of an unaccepted item. In addition each customer and collecting bank so transferring an item and receiving a settlement or other consideration engages that upon dishonor and any necessary notice of dishonor and protest he will take up the item.
(3) The warranties and the engagement of honor set forth in the two preceding subsections arise notwithstanding the absence of indorsement or words of guaranty or warranty in the transfer or presentment and a collecting bank remains liable for their breach despite remittance to its transferor. Damages for breach of such warranties or engagement to honor shall not exceed the consideration received by the customer or collecting bank responsible plus finance charges and expenses related to the item, if any.
(4) Unless a claim for breach of warranty under this section is made within a reasonable time after the person claiming learns of the breach, the person liable is discharged to the extent of any loss caused by the delay in making claim.
No Louisiana cases have determined whether the warranties of LSA-R.S. 10:4-207 extend to parties such as the Kobuszewskis who are makers of an instrument, defining them as third party beneficiaries, or as "other payors" under the statute. However, the question has been considered by the courts of other jurisdictions which apply the identical UCC provision contained in LSA-R.S. 10:4-207. The issue has been decided affirmatively; the drawers are entitled to the action in warranty. This exact issue was considered in New York Life Insurance Company v. Bank of Commerce (W.D.La.1985 Docket No. 81-1555 and 82-1699) [Available on WESTLAW, 1985 WL 12004]. Although we are not *532 bound by that decision, we adopt as sound the reasoning contained therein. See also Allied Concord Financial Corporation v. Bank of America National Trust & Savings Association, 275 Cal.App.2d 1, 80 Cal.Rptr. 622 (1969); Sun `N Sand, Inc. v. United California Bank, 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920 (1978). Cf. Clarkson v. Selected Risks Insurance Company v. Newton Trust Company, 170 N.J.Super. 373, 406 A.2d 494 (1979); Riedel v. First National Bank of Oregon, 287 Or. 285, 598 P.2d 302 (1979).
Therefore, because the plaintiffs' claim in this case is brought under the transfer warranties of LSA-R.S. 10:4-207, rather than under the delictual remedies of LSA-R.S. 10:3-419, the one year delictual prescriptive period of Daube does not apply.
We cannot say that the plaintiffs' action is a suit on a negotiable instrument subject to the five year liberative prescriptive period under LSA-C.C. Art. 3498. In Daube v. Bruno, supra, the Louisiana Supreme Court said:
Moreover, the courts of appeal also fell into error in interpreting the concept of an action on a negotiable instrument or a note too broadly. An action on a negotiable or nonnegotiable instrument, as envisioned by Civil Code art. 3498, is one by the holder of a note against a defendant whose name is on the note as maker, indorser or in some other capacity. Couch v. Couch Rice Huller Co., 1 Peltier 14 (Orleans App.1918). The prescriptive period applies only to actions on the instrument itself, those actions for the breach of the contract which the note represents, for the payment of the note according to its terms. Succession of Guillemin, 2 La.Ann. 634 (Orleans 1847). The five year prescriptive period does not apply to ancillary claims arising out of, but foreign to the instrument. A suit which merely involves an instrument, even though it is for the amount of the note, is not on the instrument itself, but for an ancillary claim. ...
The present case does not concern a suit between a holder of an instrument and the maker or indorser of that instrument. Therefore, under the reasoning of Daube, this is not a suit on a negotiable instrument subject to five year liberative prescription.
Following the decision in Daube, the correct prescriptive period for a cause of action under our Commercial Laws becomes unclear. LSA-R.S. 10:4-207(4), quoted above, provides that claims for breach of warranty under this section must be made within a reasonable time after the person claiming learns of the breach. If not made within a reasonable time, the person liable is discharged to the extent of any loss caused by the delay in making the claim. LSA-R.S. 10:1-204 provides that "what is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action."
Under this theory, the plaintiffs' claim has not prescribed. Plaintiffs made demand upon the banks within three months of discovery of the forgeries. We do not find that the three month period between the discovery of the breach and demand upon the banks constituted an unreasonable period of time.
Further, this may be considered a suit for the collection of money and the prescriptive period would be three years from the date of discovery of the forgery under LSA-C.C. Art. 3494. The correct prescriptive period may also be ten years for personal actions under LSA-C.C. Art. 3497. However, under any theory, we do not find that the plaintiffs' claim has prescribed.
Even if the one year prescriptive period for torts was applicable to this case, it is clear that the plaintiffs' claims for recovery against the banks have not prescribed. The trial court found that the plaintiffs did not learn of Scriber's conversion of their funds until December, 1983 or January, 1984. Although the plaintiffs' suspicions may have arisen somewhat earlier, the record supports the trial court's finding that the plaintiffs did not have actual knowledge that Scriber had wrongfully taken their money until late 1983 or early 1984. The plaintiffs filed suit in April, 1984, well within one year of discovery of Scriber's actions. Therefore, even if the *533 one year tort period for liberative prescription is applicable to this case, the plaintiffs' claims have not prescribed.
Therefore the exceptions of prescription filed by CNB, FSB and National Reserve are overruled.

PLAINTIFFS' CAUSE OF ACTION AGAINST CNB
CNB contends that the plaintiffs, as makers of the checks, have no direct cause of action against CNB, a collecting bank, for payment of the checks on forged indorsements, based upon the transfer warranties of LSA-R.S. 10:4-207. We find this argument to be meritless.
The purpose in allowing the makers, as third party beneficiaries, to proceed against a collecting bank for payment over a forged indorsement is to avoid the circuity of actions which would result from requiring the maker to sue only the maker's bank and forcing the maker's bank then to file suit against the collecting bank.
For the reasons set forth earlier, we find that the plaintiffs do have a direct cause of action against CNB under the warranties of LSA-R.S. 10:4-207.

APPARENT AUTHORITY AND TERMINATION OF AGENCY
CNB argues that the trial court erred in rejecting the plaintiffs' demands against National Reserve. CNB also argues that the trial court should have granted total indemnity to CNB against National Reserve, rather than finding that CNB and National Reserve were equally at fault in allowing Scriber to carry out his scheme. Likewise, National Reserve contends that the trial court erred in finding that it breached a duty to CNB. We find these arguments to be meritless.
First, CNB argues that the trial court erred in rejecting the plaintiffs' demands against National Reserve. The trial court denied plaintiffs' claim against National Reserve, finding that National Reserve had not clothed Scriber with apparent authority to act as its agent and therefore National Reserve was not liable to the plaintiff. There are two elements of apparent authority. First, the principal must make some form of manifestation to an innocent third party and, second, the third party must reasonably rely on the purported authority of the agent as a result of the principal's manifestations. Confederate Welding v. Bank of the Mid-South, 458 So.2d 1370 (La.App. 2d Cir.1984), writ denied 462 So.2d 1264 (La.1985); Pargas, Inc. v. Estate of Taylor, 416 So.2d 1358 (La. App. 3rd Cir.1982).
In the present case, there was no contact between National Reserve and the plaintiffs. National Reserve neither made nor expressed any manifestations to the plaintiffs regarding Scriber's authority to act as agent for the company. Our review of the record reveals that the trial court finding that Scriber was not acting as the agent of National Reserve and that the plaintiffs could not recover against National Reserve was not clearly wrong and is supported by the evidence. Because the trial court finding was not manifestly erroneous, we will not reverse on appeal. Arceneaux v. Dominque, 365 So.2d 1330 (La. 1978), on remand 370 So.2d 1262, writ denied 374 So.2d 660 (La.1979); Canter v. Koehring, 283 So.2d 716 (La.1973).
CNB next argues that the trial court erred in failing to grant full indemnity to CNB against National Reserve. National Reserve in turn argues that CNB was totally at fault in allowing Scriber to open an account in the name of National Reserve and to make indorsements in the name of the company without determining that Scriber had authority to do so. We find that the trial court was correct in finding CNB and National Reserve equally at fault in contributing to a situation which aided Scriber in carrying out his fraudulent scheme.
First, CNB allowed Scriber to open an account in the name of National Reserve without checking his authority to do so. Next, CNB allowed Scriber to indorse checks made payable to National Reserve; again, no effort was made to check on his authority to do so. Allowing Scriber to carry out these acts without making some inquiry into his authority constituted conduct *534 falling below reasonable commercial standards and subjected CNB to liability for those acts. Confederate Welding v. Bank of the Mid South, supra; Pargas. Inc. v. Estate of Taylor, supra. Therefore, CNB was negligent in its actions in this case and because of that negligence cannot totally escape liability.
Nor can it be said that National Reserve ratified the ultra vires acts of its agent by failing to repudiate them. CNB argues that because National Reserve notified the Louisiana Insurance Commission of the termination of Scriber's agency pursuant to LSA-R.S. 22:1170 rather than under LSA-R.S. 22:1120, the notice was ineffective. This argument is meritless.
LSA-R.S. 22:1170 pertains to notice of termination of agents other than life insurance agents and does not require that the notice contain a statement of reasons for the termination. LSA-R.S. 22:1120 pertains to notice of termination of life insurance agents and does require such a statement. However, the notice given by National Reserve did inform the insurance commission that the agency contracts between the company and Scriber had been terminated. It is reasonable to expect that any party who made inquiry to the insurance commission following such notice would have learned that Scriber's agency status had been terminated. Therefore National Reserve had effectively terminated Scriber's authority and had repudiated his ultra vires acts.
National Reserve also breached a duty to CNB and must partially indemnify CNB. National Reserve was put on notice of the unauthorized account in its name at CNB following the incident with Mrs. Jolley. National Reserve had a duty to contact CNB and inform the bank of the unauthorized nature of both the account and the indorsements by Scriber as agent for the company. National Reserve breached that duty and must partially indemnify CNB.
These assignments of error are without merit.

FORGED INDORSEMENTS
CNB next argues that the plaintiffs cannot assert that indorsements made by Scriber were not unauthorized or forged because, even though the indorsements were not authorized when they were made, National Reserve ratified the indorsements by its actions in the Jolley incident. In that incident, National Reserve returned to Mrs. Jolley the amount she had paid Scriber for annuities, plus interest. National Reserve collected from Scriber the money Mrs. Jolley had paid him for the annuities. Although National Reserve did ratify the forged indorsement or the check from Mrs. Jolley, we conclude that National Reserve did not ratify the forged indorsements in this case. CNB's argument in this regard is without merit.
LSA-R.S. 10:3-404 provides that any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it. The statute further provides that any unauthorized signature may be ratified for all purposes of the chapter.
Ratification is the adoption or affirmance by a principal of the acts of his agent and requires, on the part of the principal, knowledge of the facts, consent, and either express or implied intent to ratify. Spence v. Webster Parish School Board, 499 So.2d 217 (La.App. 2d Cir.1986).
Based upon the facts of this case, we do not find clear intent on the part of National Reserve to ratify the indorsements made by Scriber on the checks drawn by the Kobuszewskis.
While it is true that National Reserve ratified Scriber's acts in Mrs. Jolley's case, when the events in the present case arose, National Reserve had affirmatively terminated Scriber's agency contract and had notified the Louisiana Insurance Commission that Scriber was no longer its agent. National Reserve did not reimburse the plaintiffs as was done with Mrs. Jolley. Therefore, National Reserve did not ratify Scriber's forged indorsements on plaintiffs' checks.

AUTHORITY TO OPEN CHECKING ACCOUNT AT FSB
FSB argues that the trial court erred in finding that Scriber had no authority to *535 open the checking account at FSB. FSB argues that the account which Scriber opened in that bank in the name of National Reserve was his own personal and business account and had no connection with National Reserve. This argument is without merit.
FSB cites Scriber's testimony that the account which he opened in the name of National Reserve was intended for his own personal and business account. FSB then argues that Scriber had formed his own life annuity company called National Reserve which was in no way related to the defendant in this case, National Reserve Life Insurance Company, and therefore the bank had no duty to check Scriber's authority to open the account. This argument is totally unsupported by the record in this case.
The record clearly shows and Scriber admits that he was defrauding clients and had no intention of securing annuity policies for them in return for the amounts which were paid to him. It is also undisputed that Scriber, in order to carry out his scheme, had forms printed based upon those issued to National Reserve agents. Scriber had not formed his own annuity company, but rather was attempting to create the illusion that he was working for National Reserve.
FSB had a duty, as did CNB, according to reasonable commercial standards, to check Scriber's authority to open the account in the name of National Reserve and to indorse as agent checks made payable to National Reserve. This duty was discussed above. FSB breached that duty, not only when it allowed Scriber to open an unauthorized account, but also when it paid checks issued to National Reserve over Scriber's unauthorized and forged indorsement. The trial court was correct in assessing liability to FSB based upon these breaches of duty.

AMOUNTS RECEIVED BY THE PLAINTIFFS FROM SCRIBER
Both CNB and FSB argue that the amounts of the judgment rendered against them should be reduced by the amounts paid by Scriber to both Mr. Kobuszewski and his mother, Mrs. Kobuszewski. The plaintiffs argue that any claim of payment of a part of the debt is in the nature of an affirmative defense that must be specially pleaded, and that the failure of CNB and FSB to plead these defenses precludes them from now asserting their claims. For the following reasons, we find the arguments of CNB and FSB to have merit and adjust the final judgment accordingly.
LSA-C.C.P. Art. 1005 provides that the answer shall affirmatively set forth defenses such as extinguishment of the obligations in any manner. In a suit in which the defendant fails to plead this affirmative defense, evidence that the debt has been extinguished, fully or partially, is inadmissible. Bio-Medical Laboratories, Inc. v. Harvey, 359 So.2d 277 (La.App. 4th 1978).
An affirmative defense which must be specially pleaded is one which raises new matter not covered by the plaintiff's petition which will defeat the plaintiff's demand on its merits. Mashburn Agency, Inc. v. Universal Engineering & Supply, Inc., 451 So.2d 113 (La.App. 3rd Cir.1984).
The general purpose of the statute requiring certain defenses to be affirmatively pleaded is to give the plaintiff fair notice of the nature of the defense and to prevent interjection of unexpected issues. Bank of Coushatta v. Evans, 313 So.2d 644 (La. App. 2d Cir.1975).
Where, however, an affirmative defense has not been pleaded by the defendant, but the plaintiff fails to object to the introduction of evidence that bears upon the affirmative defense, the pleadings are considered to have been enlarged to include the affirmative defense and the court can act as though the affirmative defense had been pleaded. DLJ of Louisiana # 1 v. Green Thumb, Inc., 376 So.2d 121 (La. 1979); Austrum v. Baton Rouge, 282 So. 2d 434 (La.1973).
In the present case, none of the defendants have affirmatively pled the issue *536 of partial extinguishment of the debts resulting from payments made to the plaintiffs by Scriber. However, as to Mr. Kobuszewski, the plaintiffs raised the issue of partial payment by Scriber in their petition. The plaintiffs alleged in their original petition that Scriber had made payments to Mr. Kobuszewski in the amount of $1,310.98 representing "a partial withdrawal from his annuity policy." Therefore, as to Mr. Kobuszewski, the issue of partial extinguishment of the debt was properly raised in the trial court by the plaintiffs' pleadings.
As to both Mrs. Kobuszewski and Mr. Kobuszewski, evidence was introduced in the trial court, without objection by any party, which shows that several checks were issued by Scriber to the plaintiffs, drawn on the accounts at CNB and FSB in the name of National Reserve. The evidence shows that Scriber issued two checks totalling $2,200 to Mr. Kobuszewski on the CNB account in the name of National Reserve.[1] Scriber also issued three checks to Mr. Kobuszewski totalling $1,468.48 drawn on the account at FSB in the name of National Reserve.[2]
CNB also argues that Scriber paid Mrs. Kobuszewski $1,682.50 from the National Reserve account at that bank. The evidence supports CNB's claim.[3]
Accordingly, the judgment against CNB in favor of Mr. Kobuszewski is reduced by $2,200. CNB's judgment against National Reserve is accordingly reduced by the same amount.
The judgment against FSB in favor of Mr. Kobuszewski is reduced by $1,468.48.
The judgment against CNB in favor of Mrs. Kobuszewski is reduced by $1,682.50. The judgment in favor of CNB against National Reserve is reduced by the same amount.

ATTORNEY FEES
National Reserve, FNB, CNB and FSB argue that the trial court erred in awarding attorney fees to the plaintiffs. We find this argument to have merit.
The trial court awarded attorney fees to the plaintiffs under the authority of LSA-R.S. 10:4-207(3) which provides in pertinent part:
Damages for breach of such warranties or engagements to honor shall not exceed the consideration received by the customer or collecting bank responsible plus finance charges and expenses related to the item, if any.
This statute is taken directly from the Uniform Commercial Code. UCC Comment 5 provides:
The "expenses" referred to in this phrase may be ordinary collecting expenses and in appropriate cases could also include such expenses as attorney fees.
Some states which have adopted this UCC provision have held that whether a successful party will be allowed to recover attorney fees as an element of expenses is within the discretion of the trial court. Southern Provisions, Inc. v. Harris Trust & Savings Bank, 96 Ill.App.3d 745, 52 Ill. Dec. 352, 422 N.E.2d 33 (1981). Other states have looked to the judicial policy of their particular state to find that if the legislature had intended expenses to include attorney fees, the provision would have been included in the statute, rather than relying solely upon the authority of the comment. Riedel v. First National Bank of Oregon, supra.
The defendants point out that when LSA-R.S. 10:4-207 was adopted by the legislature *537 of this state, the official UCC comments were excluded. 1974 La. Acts No. 92. The defendants argue that this exclusion indicates an intent on the part of the legislature to exclude attorney fees as an item of expenses under the statute.
Under Louisiana law, attorney fees may be allowed only where authorized by statute or contract. Quealy v. Paine, Webber, Jackson & Curtis, 475 So.2d 756 (La.1985); McJunkins Tire Center, Inc. v. Barnhill, 488 So.2d 1048 (La.App. 2d Cir. 1986). The litigants have not cited any cases or authority in which the term "expenses" has been held by a court of this state to include an award of attorney fees. However, there is jurisprudence in other areas of the law to the effect that expenses do not include attorney fees. See Mire v. Magnifique Volkswagen, Inc., 274 So.2d 463 (La.App. 3rd Cir.1973); Kiefer v. Bernie Dumas Buick Company, 210 So.2d 569 (La.App. 4th Cir.1968).[4]
Because attorney fees are penal in nature, they are not favored and should be awarded only in cases which are clear and free from doubt. Texas Industries v. Roach, 426 So.2d 315 (La.App. 2d Cir.1983).
In the present case, it is far from clear that our legislature intended to statutorily include attorney fees as an item of expenses recoverable by a successful litigant under LSA-R.S. 10:4-207. Therefore, we are compelled to hold that, in the absence of clear statutory authority for the award of attorney fees to the plaintiffs in this case, the trial court erred in making such an award.
Although an injustice may appear to occur in some cases where a litigant may be required to bear his own attorney fees, nevertheless, we feel bound by the line of narrow jurisprudence which prohibits the award of attorney fees except when specifically authorized by contract or statute. Any further resolution of this issue must await a pronouncement by the Louisiana Supreme Court or the legislature.
Accordingly, we reverse that portion of the trial court judgment awarding attorney fees to the plaintiffs.

CONCLUSION
For the above stated reasons, we affirm that portion of the trial court judgment allowing recovery in favor of the plaintiffs against CNB, FSB, FNB, and National Reserve. However, we amend and reduce the amounts awarded to the plaintiffs to allow for amounts refunded to the plaintiffs by the defendant, W. Carey Scriber.
We reverse that portion of the trial court judgment granting attorney fees of $1,500 to Mrs. Kobuszewski against FSB, $16,000 in attorney fees to Mrs. Kobuszewski against CNB, $2,700 in attorney fees to Mr. Kobuszewski against FSB and $7,000 in attorney fees to Mr. Kobuszewski against CNB.
Accordingly, the trial court judgment is recast as follows:
IT IS ORDERED, ADJUDGED AND DECREED:

1.
That there be judgment in favor of LEA P. KOBUSZEWSKI and against W. CAREY SCRIBER in the amount of Ten Thousand and No/100 ($10,000.00) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs.

2.
That there be judgment in favor of LEA P. KOBUSZEWSKI, and against the COMMERCIAL NATIONAL BANK and the FIRST NATIONAL BANK OF SHREVEPORT, in solido, for the amount of Twenty-five Thousand and No/100 ($25,000.00) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs; AND FURTHER, that there be judgment in favor of Third Party Plaintiff, the FIRST NATIONAL BANK OF SHREVEPORT, against COMMERCIAL NATIONAL BANK for the *538 same sum of Twenty-five Thousand and No/100 ($25,000.00) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs.

3.
That there be further judgment in favor of LEA P. KOBUSZEWSKI, and against the FIRST SECURITY BANK AND TRUST COMPANY, the COMMERCIAL NATIONAL BANK, and the FIRST NATIONAL BANK, in solido, for Five Thousand and No/100 ($5,000.00) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs, AND FURTHER, that there be judgment in favor of Third Party Plaintiff, COMMERCIAL NATIONAL BANK, against the FIRST SECURITY BANK AND TRUST COMPANY for the sum of Five Thousand and No/100 ($5,000.00) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs; AND FURTHER, that there be judgment in favor of Third Party Plaintiff, the FIRST NATIONAL BANK, against the COMMERCIAL NATIONAL BANK, for the same sum of Five Thousand and No/100 ($5,000.00) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs.

4.
That there be further judgment in favor of LEA P. KOBUSZEWSKI, and against the COMMERCIAL NATIONAL BANK for the sum of Twenty-eight Thousand Three Hundred Seventeen and 50/100 ($28,317.50) Dollars, with twelve (12%) percent per annum interest on all sums due from April 10, 1984, until paid, and court costs.

5.
That there be judgment in favor of SEBERT MARK KOBUSZEWSKI, and against the FIRST SECURITY BANK AND TRUST COMPANY and the COMMERCIAL NATIONAL BANK, in solido, for Seven Thousand Five Hundred Thirty-one and 52/100 ($7,531.52) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs; AND FURTHER, that there be judgment in favor of Third Party Plaintiff, COMMERCIAL NATIONAL BANK, against FIRST SECURITY BANK AND TRUST COMPANY for the same sum of Seven Thousand Five Hundred Thirty-One and 52/100 ($7,531.52) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs.

6.
That there be further judgment in favor of SEBERT MARK KOBUSZEWSKI, and against the COMMERCIAL NATIONAL BANK for the sum of Twenty-two Thousand Three Hundred and No/100 ($22,300.00) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs.

7.
That there be judgment in favor of COMMERCIAL NATIONAL BANK and against the NATIONAL RESERVE LIFE INSURANCE COMPANY for Thirty-Seven Thousand, Eight Hundred Eight and 75/100 ($37,808.75) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs.

8.
That the Third Party Demands of NATIONAL RESERVE LIFE INSURANCE COMPANY against COMMERCIAL NATIONAL BANK, AMERICAN INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY are rejected and denied.

9.
That the demands of plaintiffs, LEA P. KOBUSZEWSKI and SEBERT MARK KOBUSZEWSKI, against NATIONAL RESERVE LIFE INSURANCE COMPANY and AMERICAN INSURANCE COMPANY are rejected and denied.

10.
That there be judgment in favor of Third Party Plaintiff, NATIONAL RESERVE LIFE INSURANCE COMPANY and against W. CAREY SCRIBER for the sum of Thirty-Seven Thousand, Eight Hundred Eight and 75/100 ($37,808.75) Dollars, with twelve (12%) percent per annum interest *539 thereon from April 10, 1984, until paid, and court costs.

11.
That there be judgment in favor of Third Party Plaintiff, FIRST SECURITY BANK AND TRUST COMPANY, and against W. CAREY SCRIBER for the sum of Twelve Thousand Five Hundred Thirty-one and 52/100 ($12,531.52) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs.

12.
That there be judgment in favor of COMMERCIAL NATIONAL BANK and against W. CAREY SCRIBER for Thirty-Seven Thousand, Eight Hundred Eight and 75/100 ($37,808.75) Dollars, with twelve (12%) percent per annum interest thereon from April 10, 1984, until paid, and court costs.
AFFIRMED IN PART, AMENDED IN PART AND REVERSED IN PART.

ON APPLICATION FOR REHEARING
Before FRED W. JONES, LINDSAY, JASPER E. JONES, SEXTON and NORRIS, JJ.
Rehearing denied.
NOTES
[1] National Reserve's exhibits, admitted into evidence without objection, include check No. 1018 for $2,000 and check No. 1097 for $200 drawn by Scriber on National Reserve's account at CNB and made payable to Mark Kobuszewski.
[2] National Reserve's exhibits, admitted into evidence without objection, include check No. 168 for $157.50, check No. 181 for $655.49, and check No. 189 for $655.49, all drawn by Scriber on National Reserve's account at FSB and made payable to Mark Kobuszewski.
[3] National Reserve's exhibits, introduced into evidence without objection, include check No. 486 for $500, check No. 515 for $500, check No. 1002 for $500 and check No. 1016 for $182.50, all drawn by Scriber on National Reserve's account at CNB and made payable to Lea P. Kobuszewski.
[4] We note that LSA-C.C. Art. 2545 was amended in 1968 to specifically include attorney fees as recoverable expenses in a suit in redhibition where the seller has concealed defects. The inference remains that unless specifically provided by contract or statute, attorney fees do not constitute a recoverable element of expenses.